(76 South. 202)

No. 22516.

FINLAY v. LOUISIANA IRRIGATION & MILL CO.

(June 30, 1917.)

*(Syllabus by the Court.)*

1. RECEIVERS ⚖=198(1)—AMOUNT OF COMPENSATION—STATUTE.

In determining what the "nature of the case justifies" within the meaning of the law (Act No. 159 of 1898, § 6), which declares that when a receiver is authorized to conduct the business of a corporation as a going concern "his compensation shall be fixed at such reasonable sum as the nature of the case justifies," a court will consider the responsibility assumed, the difficulties encountered, the knowledge, experience, and time required in, and devoted to, the work, and the result achieved, all with a certain regard to the values involved and the ability of the corporation to pay its debts. What would be a reasonable compensation for an individual, heavily in debt, to pay for the conduct of his business with average success, during a given period, is a fair criterion by which to determine the amount that should be paid for the like conduct, by a receiver, of the business of a corporation similarly situated.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 392–395.]

2. RECEIVERS ⚖=194, 198(1) — AMOUNT OF COMPENSATION—PROFITS.

The mere fact that the business of irrigating rice land shows an unusual profit, for a particular season, when conducted by a receiver, has but little to do with the fixing of the compensation to be allowed either to the receiver, his attorneys, or his employés, when it appears that the season was unusually favorable to the rice planting industry, that the prosperity was shared by all so engaged, and that it was attributable rather to natural conditions than to individual effort.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 385, 386, 392–395.]

Appeal from Eighteenth Judicial District Court, Parish of Acadia; William Campbell, Judge.

Suit by August M. Finlay against the Louisiana Irrigation & Mill Company, in which a receiver was appointed. On opposition by defendant to the receiver's final account the allowances to the receiver, to the general manager appointed by him, and to his attorneys were reduced, and from such judgment, the receiver and others appeal. Judgment amended and affirmed.

Howe, Fenner, Spencer & Cocke, of New Orleans, and Philip S. Pugh, of Crowley, for appellants. Smith & Carmouche, of Crowley, for appellee.

## Statement of the Case.

MONROE, C. J. In a proceeding by consent, instituted on February 7, 1916, an order was made by the district court appointing a receiver for the defendant company, with authority to continue its business, and the appointee qualified and entered upon the discharge of his functions on the following day. At the expiration of about 11 months (on February 1, 1917), another judgment, by consent, was rendered, reinstating defendant in the control of its property, save as to cer-

tain funds held in suspense to satisfy the judgment to be finally rendered upon defendant's opposition to certain items upon the receiver's final account, to wit, an item of $16,000 with which he credited himself, in addition to $1,200, drawn during his gestion, as compensation for his services, an item of $6,499.93, placed to the credit of the general manager appointed by him, in addition to $3,500.07 paid during the receivership for services rendered by the general manager, and an item of $8,000 placed to the credit of his legal advisers. The items were opposed on the ground that the amounts allowed were excessive, and the district court sustained the opposition to the extent that it reduced the amount allowed the receiver to $5,000, less $1,200 already paid; the amount allowed the general manager to $5,000, less $4,000, already paid; and the amount allowed the attorneys to $4,000, and from that judgment, the parties mentioned prosecute this appeal. The facts of the case, as we find them, are as follows:

In January, 1916, the defendant company owed a bonded debt of $467,000, secured by a mortgage which called for semiannual payments of interest amounting to $14,010, and annual payments of $23,350, to a sinking fund, and it had defaulted with respect to the interest which fell due in that month and with respect to three payments due the sinking fund, making a total of $84,060 which it owed on those accounts. It also owed ordinary debts to the amount of about $50,000, and it required cash (or a credit to be drawn on) to the amount of, say, $125,000 to enable it to carry on its business until the rice crop of 1916 could be made and harvested.

Of the outstanding bonds, the Interstate Banking & Trust Company held $280,000, and was the trustee of the mortgage, and an estate represented by a Mr. Goren held $164,000, and the defendant was given to understand that the mortgage would be foreclosed unless the situation was improved. Its then president, therefore, called at the place of business of the bank and had a consultation with its president, its legal adviser, and Mr. Goren, the result of which was an understanding to the effect that the bondholders would not foreclose if the company would make good its defaults with respect to the interest and amount due the sinking fund, and would arrange to obtain the money wherewith to conduct its business during the then coming year. Its president accordingly returned to Crowley, whence he had come, and endeavored to obtain, and arrange to obtain, the funds required for those purposes; but, having been unsuccessful, he came back to New Orleans, and there was another interview between the same parties, concerning which the counsel for the bank, afterwards counsel for the receiver, gives the following testimony, to wit:

"I then suggested that I thought it would be practicable to have a receiver appointed and the company run by the issuance and negotiation of receiver's certificates to secure the money necessary in order to conduct the operations of the company for the ensuing year, and that if the bondholders would agree not to take any action with relation to the defaults, it might thereby be possible for the company to rehabilitate itself financially. The result was the suggestion was adopted, and I thereupon prepared the papers in this suit in which this receiver was appointed."

What the bondholders actually agreed to, if to anything, is not shown, but the inference that we draw from the subsequent events and from the fact that the company made good its defaults with money obtained from other sources than the bank or the receiver's certificates is that the bondholders required that the money should be so obtained and used. The only person, other than the counsel, who gave any testimony bearing upon the agreement for the appointment of a receiver was defendant's then president, who gave the following, which stands entirely unquestioned, to wit:

"I went down to see Mr. Dinkins, president of the Interstate Banking & Trust Company, who were the trustees of the bondholders, to see

what arrangements could be made, and Mr. Dinkins said that he would not advance any money unless we could arrange for an amicable receivership. * * * I suggested at that time that the receivership would possibly be an expensive proceeding, and he said that, if it was an amicable receivership, it would not be burdened with any undue expense, and that it would be mainly operated for the benefit of the bondholders, to whom some past sinking funds were due than for the benefit of the creditors, more for the benefit of the stockholders. Q. What did you do, then, after this suggestion? A. I agreed to this amicable receivership whereby there would be no litigation and no expense incurred. Q. About what would the expense be, according to the idea that you got from Mr. Dinkins? A. I understood him to say, that it would not be a great deal, that he had in mind a person for the receivership who was acting in the same capacity for some other interests, and that some of them were located in this vicinity, and that, necessarily, the fees would be very much cut down, and would be nominal. I asked about the attorney's fees and suggested, if an attorney could help out in the matter, and he said, 'In that event, of course, * * * I do not ask that they work for nothing, but I think, possibly, $400, or $500, would be a reasonable fee.' " (We are informed that the figures as thus given were erroneously transcribed and that the witness answered "possibly $4,500.")

The receiver gives the following, with other, testimony concerning his relation to the bank and to his appointment:

"Q. You are very closely connected with the Interstate Banking & Trust Company, are you not? A. Rather closely. Q. You receive a salary from them? A. I receive compensation for services performed as a receiver. Q. You operated the receivership of the White Lake Company, did you not? A. Together with some one else. * * * Q. When did that terminate? A. Last Saturday."

It elsewhere appears, as we understand his testimony, that he was also, in addition to the White Lake affair, operating a receivership, or something of the kind, in the parish of Ouachita. During his gestion in this matter, he, through his counsel, presented to the court, and without opposition obtained, orders as prayed for, as follows: Authorizing him to borrow $10,000 wherewith to pay taxes, etc.; to issue and sell $200,000 of receiver's certificates; to file an auditor's report and inventory; to file severally, and obtain approval of, three quarterly statements and a final tableau; to pay certain privileged claims; to sell additional certificates for the payment of the interest coupons upon $139,000 of such certificates previously ·sold; to improve the plant; to surrender the property to the company and for his discharge. He engaged a general manager and an assistant to the general manager; retained the bookkeeper and the cashier whom he found in the office, or, perhaps, it was the general manager who did so, and conducted the business of the company, in which it does not appear that he had had any previous experience, by visiting the plant upon an average of once a month and having interviews with the general manager, in New Orleans, say, once a week. He testifies that he wrote to four of the New Orleans banks, offering his certificates for sale, and received an answer from but one of them, which declined to buy, as did also Mr. Goren, and that he sold $139,000 of them, bearing interest at 6 per cent., to the Interstate Banking & Trust Company at a price which assured the purchaser 8 per cent. interest upon its investment. Being asked by his counsel to state the consideration upon which he based his claim for $17,200, he replied that he based it on the result of the handling of the receivership under his direction, which result, according to his view and theory of bookkeeping, consisted of a net profit of $142,741.94. He mentions, specifically, as acts of administration showing his value, his employment of a competent general manager; certain contracts entered into by him for fuel oil, to be delivered, in 1917, at prices which, as he thought, would save the company $9,000; contracts with certain of the farmers whereby they agreed to give a fifth of the crops made by them for water, instead of paying $6 an acre therefor; the fact, that more rice was received for water rents under his administration than in previous years, and hence that the profits of the company were greater, per acre, and otherwise. It is abun-

dantly shown, and admitted, that the season of 1916 was the most favorable for the rice planting industry that has been known for many years, or, possibly, that has ever been known in this state. It is not shown that the receivership did better in its operations than any other concern engaged in the same business, and, if the claims here in dispute are allowed, it will have done considerably worse than others similarly situated but not operated by receivers.

The general manager also bases his claim, for $10,000, upon the result, taken in connection with an understanding, to which he and the receiver testify, and upon the fact that during his employment by the receiver he, like his employer, divided his time between that and other employments, and was paid, in proportion for the latter more than the district court has allowed him for the former. Concerning his understanding with the receiver, he testifies that he had a conversation with him upon the subject of his employment, and, after taking time to consider, decided to accept it, and so informed the receiver, and, further, as follows:

"He then wanted to know what I would charge, and I said I could not tell that; that that was a matter I was perfectly willing to leave open, to be decided later. Then, after talking a while, he suggested a drawing account of $3,000 a year at first, and then he changed it to $4,000. I told him that he could not hire me at $4,000 a year, and I told him that, if I made it a success, my final compensation would be the result of what I did with the property—that was agreeable to me. On Monday morning, the 14th of February, I took charge of the property."

Immediately upon taking charge, the general manager wrote a letter to the cashier, reading, in part, as follows:

"Mr. S. P. Johnston, Cashier—Crowley, La.— Dear Sir: The employés listed below have been arranged with on the following basis:

S. P. Johnston, cashier and general office, per month .................................... $166 67
Jno. T. Bethany, bookkeeper and general office, per month............................... $125 00
L. P. Elberon, sup't of plants, per month.... $150 00

W. S. White, civil engineer and canal manager, per month............................... $150 00
W. H. Hunter, general manager, per month.. $333 33

*    *    *    *    *    *    *

"In making up your semimonthly pay roll, the above will apply unless otherwise advised
"Yours truly,        W. H. Hunter,
"General Manager."

The cashier testifies that he was never "otherwise advised."

Upon the question of the compensation received by him from other companies during the period of his employment by the receiver, the general manager testifies that was general manager of the Hunter Canal Company, which irrigates from 15,000 to 19,000 acres of land, as against 39,000 acres irrigated by the company now before the court, and that he was paid by the Hunter Company $5,000 a year, was permitted to use his own teams, which gave him $1,000 or $1,500 more, and to handle the rice of the company, which gave him about $2,000, "in addition to his interest." In his cross-examination we find the following:

"Q. Your salary from the Hunter Canal is $5,000? A. Yes, sir; $5,000, with the privileges of which I have spoken. The stock is owned by Hunter Bros., but I own ⅔ of it, so I practically pay my own salary."

With regard to another company, from which he drew $4,000, it appears that he is a member of the executive committee of the Louisiana Rice Growers' Association, and up to a year prior to the giving of his testimony was chairman of that committee and drew a salary for his services in that capacity, but that thereafter the salary of $4,000, though paid by the Rice Growers' Association, was charged by it to the Industrial Improvement (or Development) Company, which, as we infer, is a subsidiary of the other and of which the witness is president. No other witness has testified that he receives more than $5,000 a year for managing an irrigation plant, nor has any such person been mentioned. Mr. Kaplan is the manager and president of the United Irrigation & Rice Milling Com-

pany, which irrigates from 27,000 to 35,000 acres of land, and of the Morris Canal, which irrigates 6,000 or 7,000 acres. He does all the financiering required by those concerns, as well as the managing, and receives $300 a month from the one and, is "supposed to receive," $50 a month from the other. The two companies get from 72,000 to 75,000 sacks of "water rent rice" a year, which is probably more than was delivered to the receiver.

Prior to the receivership, Mr. Lawrence, the president of the company now before the court, and Mr. Marsh, who became the manager, did the work that was done by the receiver and by Mr. Hunter and his assistant, Maj. White, and the salary of Mr. Lawrence, which had been $2,500, had been increased, in 1913, to $5,000, and that of Mr. Marsh, which had been $1,800, had been increased to $2,200; and they devoted all of their time to the business of the company.

We find in the record a copy of an instrument, apparently prepared in the office of the receiver, and reading, in part, as follows:

Comparative Statement—Managerial Expenses, L. I. & M. Co.

| | 1908 | 1909 | 1910 | 1911 | 1912 | 1913 | 1914 | 1915 |
|---|---|---|---|---|---|---|---|---|
| President | 2500 | 2500 | 2500 | 2500 | 2500 | 5000 | 5000 | 5000 |
| Manager | 1800 | 1920 | 1800 | 2000 | 2000 | 2000 | 2000 | 2000 |

Attorneys, average 8 years $6,251.20

Receiver
Gen. Mgr. W. H. H.......................... $10,000 00
Receiver W. J. B............................ 1,200 00
Manager W. S. W........................... 1,800 00
Receiver W. J. B. fee...................... 16,000 00
Attys. fee ................................. 8,000 00
Auditors ................................... 1,400 00

                  $38,400 00

\*   \*   \*   \*   \*   \*   \*   \*

It appears from the evidence that the general manager sold the rice which came into his hands without calling for bids, and realized, for Nos. 1 and 2 rice $3.10 a sack, whereas the custom is to sell on competitive bidding, and several of the farmers who did so testify that they obtained $3.25 and $3.50 a sack for the same quality of rice. It also appears that the sales of rice begin in September, during which month, perhaps, the bulk of the crop is ordinarily sold, and the receiver's quarterly statement, filed November 18th, shows that he then had on hand liquid assets, consisting of cash, $198,923.95, rice and obligations for rice sold, equivalent to cash, amounting in the aggregate to $275,133.12. The cash was on deposit in the Interstate Bank, to which he was paying interest, at 6 per cent. on $139,000 of certificates sold to it, and from which he was receiving 2 per cent. interest on his deposit, and there was no change in the situation until after the judgment of the district court, save that the cash deposit increased to about $270,000.

Beyond that, the indebtedness of the company must have been increased, just before the appointment of the receiver, to the extent of $84,000, for money borrowed to pay the past-due interest on its bonds and indebtedness to the sinking fund, and, since then, to the extent of $57,390, for interest and sinking fund from January 1, 1916, to January 1, 1917, and its ordinary indebtedness as it stood when the receiver took charge (of, say, $50,000) does not appear to have been materially, if at all, decreased. It would therefore appear to owe, at this time, a bonded debt of $467,000; receiver's certificates to the amount of $139,000, and other debts to an amount exceeding $185,000, the whole aggregating, say, $800,000, some of which, it may be imagined (such as that due the sinking fund, or money borrowed to pay it, and the semiannual interest on the receiver's certificates) must be, or is likely to become, rather pressing.

## Opinion.

[1] The law declares, in effect, that, when a receiver is authorized to conduct the business of a corporation as a going concern, "his compensation shall be fixed at such reasona-

ble sum as the nature of the case justifies." Act 159 of 1898, § 6, pp. 314, 315. In determining what "the nature the case" is, within the meaning of the law, and from that the compensation to be allowed the receiver, we are to consider the responsibility assumed, the difficulties encountered, the knowledge, experience, and time required in, and devoted to, the work, and the result achieved, all with a certain regard to the values involved and the ability of the corporation to pay its debts. In this case, the receiver appears, from his testimony, to be regularly employed by the Interstate Bank to act as receiver when its interests require such appointment, and, perhaps, to discharge other functions at other times; and, his appointment having been a matter of agreement between the bank and the corporation to which he was appointed, and, it having been part of that agreement that his compensation should be nominal, we are of opinion that the representations of the bank upon that subject should not be altogether ignored, though the evidence would hardly justify us in requiring, as against the receiver, that they be made good to the letter. Having been appointed, however, upon the suggestion of the bank, representing the mortgage creditors, with the consent of the corporation to which he was appointed, to take charge of an established business, consisting of pumping water into canals and ditches, thereby distributing it over the lands through which they extend, and collecting the tolls therefor, being provided, in advance, with an established plant for the carrying on of that business, and an organized and experienced force to operate the plant, with the bank behind him to furnish, promptly and abundantly, the money that was needed, and with the attorneys of the bank, who became also his attorneys, to instruct him with respect to his legal obligations and obtain the authority of the court when required for his protection, the respon-

sibility of the receiver was reduced to a minimum, and no difficulties were either threatened or developed. That the functions which he assumed required no special knowledge or experience of the business of which he took charge is best shown by the fact that his administration was successful, though the record contains no suggestion that he possessed either; and that they required but little of his time is to be inferred from his devoting but little of it to them and being able to discharge similar functions elsewhere.

Save for the fact that he possessed the confidence of the bank, and, no doubt, kept himself and it posted in regard to the progress of events, the necessity for the disbursements that were being made, etc., we can discover no reason why the receivership should not have progressed as smoothly and as successfully without the receiver as with him. In his cross-examination, after testifying that he had, on the previous Saturday, terminated the receivership of the White Lake Company, he gave further testimony as follows:

"Q. You had other sources of income? A. Yes, sir; I had other sources of income. Q. And you gave a great deal of your time to those other matters? A. I gave the amount of time required by each source. Q. It left very little time for the affairs of the Louisiana Irrigation & Mill Company? A. It shows a net profit of $142,000. When I took over the receivership, * * * I found that it would be necessary to secure the * * * very best services in the country, so as to be on the scene and assist me in handling the situation. I had a similar position in Ouachita, and I employed the very best man there in order to get good results, and I have found that, if your assistants are the very best available, the results will naturally be of the best. * * * Q. Well, now, Mr. Hunter had very competent assistants? A. I think so. Q. Do you know, or did you know, any of the men under him; did you know anything about them? A. I know quite a little of them. Q. You retained most of the old force, did you not? A. Most of them were retained; that is my belief."

[2] From which and from the whole tenor of the testimony of the witness it is evident that, when he had employed Mr. Hunter, he con-

sidere'd that he had shifted to the shoulders of that gentleman the responsibility of employing the other members of the force and of operating the plant; in fact, it was Mr. Hunter who sold the rice, according to his own judgment, and, as the receiver visited the plant but once a month, it stands to reason that Mr. Hunter must have handled the innumerable questions that arose daily, and many times a day, an'd which required prompt decisions, without the aid of the receiver. In the office, the bookkeeper and cashier were retained, and the one kept the books and the other, perhaps, prepared the pay rolls, and drew the checks, and the one or the other probably prepared the quarterly statements and final tableau of the receiver. That gentleman mentions his letters to the banks, about the certificates, his contracts for oil, and those with the farmers, as matters for which he is entitled to credit. But he 'does not say whether the terms upon which he offered the certificates to the other banks were the same as those upon which he offered them to the Interstate Bank, and, if they were, it is hardly likely that one bank would care to invest money in certificates issued by a receiver appointed at the instance of another bank, holding, or representing, a first mortgage. Moreover, as we read the testimony, it was part of the agreement under which the receiver was appointed that the Interstate Bank should take his certificates when issue'd. The offers to the other banks were probably made, therefore, rather as a matter of form, and in order to forestall possible future criticism, than with any expectation that they would be accepted. As to the making of contracts for fuel oil, the receiver must surely have done that if he intended to do anything at all, since it is a necessity for every one who has to do with the han'dling of crops by the use of steam power to make some provision for fuel. And the same may be said of the contracts with the farmers, some of which, calling for the payment of $6 an acre "water rent," expired in the beginning of 1916. The making of new contracts of some kind with them was a routine necessity, and the fact that, as made, they called for "rice water rent," instead of "money water rent," merely indicates that the receiver was advised that the one kind of contract is more advantageous to an irrigation company than the other, which may be so, in some seasons, and quite otherwise in others. The main argument upon which the receiver relies is that the result of his administration was satisfactory; that he made a net profit of $142,000. But in the first place his figures appear to be wrong, and it is a pity that, with a bookkeeper, a cashier, and himself, he could not have file'd a statement or an account showing correctly what the net profit was. As his final account is made out, no such showing appears, and the error that we find in his testimony on the subject is that, in giving $142,741.94 as the net profit of the operations of the receivership, he fails to charge the receivership with several items with which it should be charged, including the $16,000 here claimed by him, the $8,000 claimed by his attorneys, and' other items, which he himself has charged to the receivership in the document styled "Comparative Statement —Managerial Expenses." He admits that, with such items deducted, the $142,000 would shrink to $117,000, which, it must be conceded, will not go very far towards paying the debt of approximately $800,000, still due by the defendant company, including, now, $139,000 of receiver's certificates, plus, say, $7,000 of unpaid interest, not to mention the mortgage bon'ds, principal, interest, and sinking fund. Conceding, arguendo, that it was no part of the obligation of the receivership to pay even the interest upon the mortgage 'debt or the installment due the sinking fund for the year 1916, and that $117,000 correctly shows a net profit, the question remains, Does

the mere fact that such a profit was earned, regardless of all other circumstances, entitle the receiver to take therefrom $17,200 as his compensation for such connection as he had with the earning during the 11 months of his administration, and, if so, why? Our answer is that he is not so entitled; that the unusual profit was not at all of his earning, but was the result of unusually favorable weather conditions; that for aught that he or the other appellants did, or could have done, the rice crop might have failed, and the defendant company have sustained a loss; that the work of irrigation was successfully conducted, but no more successfully than that of other irrigation companies in the same belt; that what would be a reasonable compensation for an individual, heavily in debt, to pay for the conduct of his business, with average success, during a given period, is a fair criterion by which to determine the amount that should be paid for the like conduct, by a receiver, of the business of a corporation similarly situated; and, finally, that the receiver, in our opinion, contributed less to that which has been done for the benefit of the defendant company, or its creditors, than either of the other appellants, and should be compensated in a like proportion.

The receiver refers to the $1,200 drawn by him during the year as a salary, and to the $16,000, which he now claims as a fee, and we infer that the salary was fixed by the bank and the fee by himself, which shows that we are likely to be more liberal when dealing with the funds of others than when dealing with funds which we may be called on to furnish. We are of opinion that he has been too liberal to himself in this instance, and that his fee should be reduced to $1,800, making a total of $3,000 as his compensation.

Mr. Hunter, we think, fixed his own compensation when he instructed the cashier that he "had been arranged with" on the basis of $333.33 per month, which amount he drew during the year, and would have drawn if there had been a loss of $117,000 instead of a profit. His compensation in other fields, fixed as he has stated, and paid largely from his own money, furnishes no precedent with respect to the claim that he is making here. It would have been more to the point if he had produced a single witness, of the vicinage, to testify that the amount claimed by him would be considered either reasonable or customary. The fee claimed by the counsel should, we think, be increased beyond that allowed by the judgment appealed from, but not to the amount claimed. Their services were highly important, and inured to the benefit of the defendant company; but, with respect to the advice that was most important, we find it difficult to distinguish between the service rendered to their client, the bank, and that rendered to the company. It is to be remembered that, when they advised the receivership, they were acting as the attorneys of the bank, and, if they predicated that advice upon their opinion that the bank could safely take the receiver's certificates, it was still the interest of the bank that they were considering, and were bound to consider, and, so far as we can judge, the advice has redounded to the advantage of that interest. It is true that the defendant company has also benefited thereby, but the counsel were not employed by it, did not give their advice for its benefit, and are entitled to no compensation from it on that account. Apart from that, whilst the fee charged does not seem large, as compared with the various figures that are to be found in the record, the case is one in which, speaking with reference to difficulties encountered, research required, time consumed, etc., we think we should be governed rather by the character of the service rendered, and from that point of view we are of opinion that the fee should be fixed at $5,000.

It is therefore ordered that the judgment appealed from be amended by reducing the amount allowed the receiver, W. J. Billingsley, from $5,000 to $3,000, subject to a credit of $1,200, already paid; by reducing the amount allowed W. H. Hunter, as manager, from $5,000 to $4,000, the amount already paid him; and by increasing the amount allowed Howe, Fenner, Spencer & Cocke, attorneys for the receiver, from $4,000 to $5,000. It is further ordered that, as thus amended, the judgment be affirmed, the costs of the appeal to be paid, in the proportion of one-third each by W. J. Billingsley, W. H. Hunter, and the defendant company.

LECHE, J., takes no part.